Estate of C.S. Brasington, Nancy Brasington Burns, Trustee v. Commissioner.
Estate of C.S. Brasington, Burns v. Commissioner
Docket No. 27260.
United States Tax Court
1953 Tax Ct. Memo LEXIS 9; 12 T.C.M. (CCH) 1482; T.C.M. (RIA) 54012; December 31, 1953
*9 1. Held: Since the books and records maintained by Brasington for the taxable years 1942, 1943, 1944, and 1945 were incomplete and did not properly and accurately reflect his taxable income, respondent was justified in adopting a method of computing such income which, in his opinion, did so reflect it. 2. The correctness of respondent's computations and adjustments made in his determination of Brasington's net income by the net worth method, determined and adjusted. 3. By amendment to pleadings, petitioner raised, as a separate issue, the question of whether the sale by Brasington of his orchards was consummated in 1945 or 1946. Held: The sale of such orchards was consummated on November 9, 1945, the date of the deed covering the sale. 4. Held: No part of the deficiency for any of the years 1942, 1943, 1944, and 1945 was due to fraud with intent to evade tax. 5. Held: Part of the deficiency for each of the years 1944 and 1945 was due to Brasington's negligence. Richard E. Thigpen, Esq., 112 South Trijon Street, Charlotte, N.C., for the petitioner. Newman A. Townsend, Jr., Esq., for the respondent. VAN FOSSAN Memorandum Findings of Fact and Opinion The respondent determined deficiencies in income and victory tax of C.S. Brasington and additions thereto for fraud for years and in amounts, as follows: Additions
Income and
to Tax
Year
Income Tax
Victory Tax
for Fraud
1942
$ 2,628.16
$ 1,314.08
1943
$53,496.36
26,748.18
1944
16,770.59
8,385.29
1945
16,027.90
8,013.95
By amendment to the answer, respondent affirmatively alleges, in the alternative, that petitioner is liable for the five per cent addition to tax for negligence in connection with Brasington's liability for income taxes for the calendar years 1944 and 1945. Findings of Fact The petitioner herein is the Estate of C. S. Brasington, of which Nancy Brasigton Burns is the duly qualified and acting trustee. C. S. Brasington, *11 also known as Clayton S. Brasington, is a resident of Wadesboro, North Carolina. He was adjudged incompetent on December 27, 1947. For the taxable years here involved, Brasington filed separate, individual income tax returns with the collector of internal revenue for the district of North Carolina. The statutory notice of deficiency relating to Brasington's tax liability for such years was mailed to petitioner on December 20, 1949. Consents extending the period of limitations for the assessment of additional taxes for 1944 and 1945 to June 30, 1950, were duly executed. C. S. Brasington (hereinafter some times referred to as the taxpayer) was 83 years of age on February 18, 1953. He is the husband of Annie Webb Brasington, who is 75 years old. He is the father of Nancy Lee Brasington Burns, who is married to Charles M. Burns, Jr., and Clayton Brown Brasington. Clayton Brown Brasington has two sons, Clayton Brown Brasington, Jr., and Lloyd Brasington. In March, 1938, the petitioner suffered a coronary occlusion and thereafter suffered similar attacks continuing through May, 1946. Since that time, he has been confined to his bed without hope of recovery. During, and for approximately *12 20 years prior to, the taxable years in question, the taxpayer had his own business, operating a general store wherein he handled some groceries, such as meat, lard and flour, and sold seed, feed and fertilizers. He dealt mostly in the latter. The store was located near the center of the business district in Wadesboro, North Carolina. In addition to such activity, the taxpayer also operated a cotton gin, peach orchards, and farms. He made cash advances to farmers and bought produce from them. He also did some buying and selling of cotton in the period under review. Sometime in January, 1946, the general store business was sold to Clarence Leonard, who had been an employee from about 1937. From January 1, 1920, until his incapacity, the taxpayer served continuously as a member of the board of directors of the Anson Building and Loan Association. He was also a member of the Association's appraisal committee, which made appraisals for loans on residences and occasionally on farm property. Brasington served on this committee from about 1923 until January, 1946, although he made few, if any, appraisals after April, 1943. During most of the period involved herein, the taxpayer also operated *13 two peach orchards. They were the Ruby Orchard in Chesterfield County, South Carolina, and one in Anson County, North Carolina, known as the Wall place. The Ruby Orchard had been acquired by the taxpayer on August 20, 1928, from J. L. Baker for $5,500. In 1936 and 1937, the taxpayer purchased three tracts constituting the Wall place for a total purchase price of $8,500. In 1943, the taxpayer sold some peaches from one of his orchards to or through Richter & Cochran of New York City. Under date of August 14, 1943, Richter & Cochran wrote the taxpayer as follows: "Herewith enclosing two account of sales with check. Also enclosing account of sales for the balance of cars unpaid amounting to $30,516.88. We are withholding payment as per our conversation. "Hoping you have a nice vacation, and with kindest regards to yourself and Mrs. Brasington," In January, 1944, the $30,516.88, above referred to, was received by the taxpayer and entered upon the ledger account and cash book. The amount so received was not reported by the taxpayer on an income tax return for any year. The accountant employed by petitioner treated such receipt as 1943 income inasmuch as it was in payment for part *14 of the 1943 peach crop. The books of account maintained by the taxpayer during the years involved were kept upon the single entry method of bookkeeping. Such books consisted of ledgers numbered one through five and two cash books. Posting therein was done by the taxpayer and his assistant in the ordinary course of business. The ledgers contained the taxpayer's personal accounts, the bank accounts, customer's accounts and several expense accounts. Farm, cotton, cotton gin, and peach orchard accounts were carried in the ledgers. With the exception of a record of the bank accounts, the books contained no capital accounts for the various assets owned by the taxpayer. When merchandise was sold for cash, no entry was made on any of the books with reference to the transaction or the receipt of the money. Expenses were some times paid in cash and entry thereof made. In each year involved, the cash book showed cash disbursements to exceed receipts. Some purchases and expenses for the store were not recorded. Deposits, some times including cash, were made from time to time in the taxpayer's bank accounts. Brasington himself made out the deposit slips and made no effort to deposit his receipts *15 intact. Petitioner employed a certified public accountant to audit the books and records of the taxpayer. After a complete analysis of the ledger accounts, the cash books, bank statements, and canceled checks, the accountant computed the taxpayer's net income to be as follows: 1942
$ 6,608.21
1943
70,079.19
1944
31,158.77
1945
19,558.62
The taxpayer's character and reputation were of the highest and he had a good credit rating. By deed bearing date of November 6, 1945, acknowledged November 9, 1945, and recorded on January 25, 1946, the taxpayer conveyed his peach orchards to L.G. and Carrie Bowles Dewitt for a consideration of $50,000. Also conveyed at the same time were 109 acres of land. The taxpayer realized a long term capital gain on the sale in the amount of $10,791.90. The transaction and the gain thus derived therefrom were not reported by the taxpayer on his 1945 income tax return. The sale and a gain thereon of $10,000 were reported on his 1946 return filed August 15, 1947. Such return was signed: "C. S. Brasington 8/15/'47 By Mrs. C.S. Brasington" Brasington acquired a three-fourths interest in the Wadesboro Gin on August 5, 1931, from E. *16 A. Morgan and H. T. and Hattie Brown for a total consideration of $5,031.39. He acquired the remaining one-fourth interest in the Wadesboro Gin on September 15, 1931, for $2,974.36. Of the $8,005.75, the initial cost of the Gin, $1,000 was allocated to the building, $500 to the land and $6,505.75 to the machinery. Additional machinery costing $4,111.48 was purchased in 1940. The Gin was sold on August 6, 1945, to T. M. Little for $4,000. The transaction was recorded in the taxpayer's ledger and cash book and was reported in his 1945 income tax return. As shown on the return, the sale resulted in a long term capital loss of $526.32. From October, 1944, to January 26, 1945, the taxpayer and Wade Childs engaged in buying and selling of cotton under an oral arrangement whereby the taxpayer furnished the capital for purchasing the cotton and Childs did the actual buying and selling. Childs invested no capital to purchase the cotton. The cotton was considered as being the property of the taxpayer. It was insured in his name and the insurance, the premiums for which were paid by Childs, was, in case of loss, payable to the taxpayer. Childs also paid for the weighing of the cotton and for *17 the telephone. Profits and losses on the sale of the cotton were to be equally divided by the two men. Some 2,900 bales of cotton were thus bought and sold between October, 1944, and January, 1945. All of the cotton was bought in 1944 and none in 1945. The cotton that was sold in 1945 was on hand on December 31, 1944. In January, 1945, the cotton that was on hand on December 31, 1944, was sold as follows: Number
Date
of Bales
Price
Jan. 2, 1945
131
$12,231.19
Jan. 2, 1945
2
144.02
Jan. 3, 1945
71
7,452.70
Jan. 3, 1945
15
1,582.76
Jan. 10, 1945
1
109.55
The cotton business was closed out and the cotton account maintained on the taxpayer's books was closed in January, 1945. Such account shows total receipts at December 30, 1944, amounting to $262,614.13, and at January 16, 1943, amounting to $284,396.51. The profits shown therein, as derived from the operation, were $5,558.25, of which Childs received $2,413.90. Childs' 1944 income was increased by and he paid tax upon an item "Failure to report income tax from partnership of Brasington Cotton Company in the amount of $2,200.00." The taxpayer did not report the income realized by him from the *18 cotton venture on a Federal income tax return. Nor was such income reflected in the above-mentioned computation of the accountant employed by petitioner. Brasington acquired his home in Wadesboro on October 1, 1910, from William and Mary L. Morton for $5,500. In 1919, the taxpayer purchased 40 acres of land and in succeeding years he purchased and sold a number of properties. Some time in 1940, Brasington borrowed $10,000 from the Anson Building and Loan Association. On July 2, 1940, he borrowed $3,000 more and on January 1, 1942, his total indebtedness to the Association amounted to $13,000. On August 3, 1943, he paid off the $13,000 indebtedness. Borrowers from the Anson Building and Loan Association were required to carry shares in the Association. If the shares were carried to maturity and no payments were made on the loan, the loan was automatically discharged. Brasington, in line with his loans of $10,000 and $3,000 from the Association in 1940, was buying a group of 100 shares and another group of 30 shares. Until the $10,000 note was paid, he paid $100 on the stock and $50 interest every month on the 100 shares. He paid $30 for the stock and $15 interest every month on *19 the 30 shares. When Brasington paid off the $10,000 and the $3,000 loans on August 3, 1943, the stock had not matured. During the years 1941 to 1945, inclusive, the taxpayer incurred debts to the First National Bank and to the Bank of Wadesboro, the Southern Cotton Oil Company and two individuals. All of these debts were paid by December 31, 1945. During the years 1942 to 1945, inclusive, Brasington made total deposits to his checking account at the Bank of Wadesboro, as follows: Year
Total Deposits
1942
$22,307.75
1943
21,193.75
1944
50,425.48
1945
49,503.84
During the years 1942 to 1945, inclusive, Brasington made total deposits to his regular account and to his cotton account at the First National Bank of Wadesboro, as follows: Total Deposits
Year
Regular Account
Cotton Account
1942
$125,575.44
1943
169,337.01
1944
364.031.72
$286,077.78
1945
118,889.27
1,000.00
The balances in Brasington's bank accounts at the end of each year were as follows: Bank of
First National Bank
Wadesboro
Date
Checking Account
Reg. Acct.
Cotton Acct.
Total
December 31, 1941
$ 41.15
$ 225.24
$ 266.39
December 31, 1942
19.31
359.37
378.68
December 31, 1943
104.04
1,400.46
1,504.50
December 31, 1944
8,411.75
24,693.88
$837.39
33,933.02
December 31, 1945
18,345.43
24,744.79
43,090.22
*20 On December 15, 1943, $1,151.48 was deducted from the taxpayer's deposit slips at the First National Bank of Wadesboro. On the same day, $1,515.48 was deposited to the bank account of his wife. In 1943, 1944, and 1945, the taxpayer made several loans to individuals, including a $16,000 loan to his son, C. B. Brasington. All of these loans, except the one to his son, were repaid by early 1946. In 1943, 1944, and 1945, the taxpayer purchased goernment bonds of a denominated value of $36,000. The taxpayer had a safe deposit box at the First National Bank of Wadesboro, the contents of which were inventoried in the presence of the taxpayer by respondent's agents on May 5, 1946. Several of the aforementioned bonds were found therein. In addition, the box also contained, among other things, the following Series E. Bonds: Date of
Number
Denomination
Issuance
Name in Which Issued
1
$ 500 Series E
1-25-44
Mrs. Annie W. or Clayton B. Brasington
2
$1,000 Series E
1-25-44
Mrs. Annie W. or Clayton B. Brasington
1
$ 500 Series E
1-25-44
Mrs. Annie W. Brasington or Mrs. Nancy
Lee Brasington Burns
2
$1,000 Series E
1-25-44
Mrs. Annie W. Brasington or Mrs. Nancy
Lee Brasington Burns
*21 During the years in question, the taxpayer also purchased a number of bonds, some of which were issued in the name of his children or grandchildren. In 1945, he purchased 100 shares of Greyhound stock, which he gave to his daughter. Also in 1945, the petitioner made a loan of $20,000 to his daughter, Nancy Lee Burns, evidenced by a note of his daughter and her husband. In 1943, 1944, and 1945, Brasington paid North Carolina State income taxes by checks drawn on his account at the First National Bank of Wadesboro, North Carolina, in the following amounts: Year
Amount
1943
$ 501.33
1944
1,669.22
1945
1,610.15
In 1943, 1944, and 1945 Brasington paid Federal income taxes by checks drawn on his account at the First National Bank, Wadesboro, North Carolina, in the following amounts: Year
Amount
1943
$12,431.20
1944
155.02
1945
15,643.87 His income tax returns for the foregoing years disclosed income as follows: 1942
Gross Income
$135,419.62
Less: Bad debts
$ 5,615.45
Other deduct'ns
120,076.01
125,691.46
Net business income
$ 9,728.16
Sale of capital assets: Short-term capital loss
$ (1,465.00)
Taxable net income
$ 8,541.16
1943
Gross Income
$ 33,893.38
Less: Freight
$ 3,904.51
Insurance
1,175.60
5,080.11
Net business income
$ 28,813.27
Sale of capital assets:
$ 0.
Taxable net income
$ 28,314.27
1944
Net business income
$ 32,829.22
Sale of capital assets:
$ 0.
Taxable net income
$ 32,829.22
1945
Net business income
$ 13,953.61
Sale of capital assets: Long-term capital
loss (Gin)
($526.32)
Long-term capital
gain (Land)
250.00
Net long-term loss
$ ( 276.32)
Taxable net income
$ 11,978.46
*22 The internal revenue agent initially assigned to examine Brasington's tax returns for the years in question began his investigation thereof on April 26, 1946. During the ensuing four weeks or until the latter part of May, 1946, the agent saw and spoke with the taxpayer at his store on numerous occasions and discussed with him the matter of his books, records, tax returns and the amounts reflected in each. Practically all the statements made by the taxpayer were found to be correct and corroborated by other parties. The agent prepared a report in which he computed the taxpayer's net income as best he could from the books and records of the taxpayer. The agent and his immediate superiors later agreed that such computation was probably wrong. On January 2, 1947, a special agent was assigned to the case and joined the agent initially assigned to make further investigation of the taxpayer's returns. This special agent did not at any time see or talk with the taxpayer. In their computations of Brasington's income for the years involved, the two agents used the net worth method of computation. Both agents found and made use of the taxpayer's ledgers, cash books, bank statements, canceled *23 checks and other records, including his tax returns, in amassing much of the information appearing on the balance sheets prepared for the periods ending December 31, 1941, 1942, 1943, 1944, and 1945, copies of which were attached to the notice of deficiency and formed the bases for the determination set forth therein. Other sources for such information include public records, records of individuals and concerns having dealt with the taxpayer and interviews with parties with whom the taxpayer had had business transactions. Using the increase in net worth, plus personal expenditures method, the respondent determined Brasington's net business income and his understatement thereof, for the taxable years 1942, 1943, 1944 and 1945, as follows: 1942
1943
1944
1945
Increase in net worth
$ 8,890.40
$74,944.03
$40,162.45
$ 3,968.64
Personal expenditures by check
5,017.49
5,106.39
10,864.67
1,205.11
Estimated living expenses
3,779.89
Gifts by check
1,215.43
5,241.57
4,700.26
Capital gain or loss
1,465.00
(1,161.57)
(70.00)
(10,315.56)
Contributions
187.00
380.00
Federal income tax payments
12,431.20
155.02
15,643.87
N. C. income tax payments
501.33
1,669.22
1,610.15
Gift of cash and bonds
18,390.00
Gift of stock
2,230.53
Correct business income
$16,775.32
$97,062.95
$57,481.62
$36,892.63
Business income per return
9,728.16
28,813.27
32,829.22
13,953.61
Adjustment per 90-day letter
$ 7,047.18
$68,249.68
$24,652.40
$22,939.02
*24 In the statutory notice, respondent determined Brasington's taxable net income for 1942 as $15,527.52; for 1943 an income tax net income of $96,092.35 and a victory tax net income of $97,062.95; for 1944 a taxable net income of $55,761.86, and for 1945, a taxable net income of $39,974.21. We make the following ultimate findings of fact: The books and records maintained by Brasington for the taxable years 1942, 1943, 1944 and 1945, were incomplete and did not properly and accurately reflect his taxable income. The income tax returns filed by Brasington for each of the years 1942, 1943, 1944 and 1945, were not false and fraudulent, and no part of the deficiency for each of such years was due to fraud with intent to evade tax. Part of the deficiency for each of the years 1944 and 1945 was due to Brasington's negligence. Opinion VAN FOSSAN, Judge: The first question for our consideration is whether respondent properly determined the correct taxable net income of Brasington for the taxable years 1942, 1943, 1944 and 1945. In making his determination, respondent, acting under the broad authority granted in section 41 of the Internal Revenue Code, [1] *25 has employed the so-called net worth plus personal expenditures method of computing income. Petitioner protests that respondent's action was unreasonable, arbitrary and capricious. It is petitioner's position that the method so employed does not more clearly reflect Brasington's income than the method regularly employed by the taxpayer. In this connection, petitioner points to the fact that respondent made extensive use of the books and other records maintained by Brasington in compiling the data upon which respondent's determination rests. Petitioner, in effect, argues that this fact tends to indicate that respondent's adoption of the so-called net worth method was arbitrary and that, had the necessary effort been made, an accurate computation of Brasington's income could have been made from his books and records. To prove the point, petitioner submits a comparative income and expense statement as per an analysis of records and income tax returns of Brasington, which statement was compiled by an accountant retained by petitioner for the purpose. The amounts ultimately arrived at by the accountant as representing Brasington's income are set forth in our findings and are those here *26 advocated by petitioner as more nearly approaching the correct amount of the taxpayer's income during the years involved than those computed by respondent's method. The books of account maintained by Brasington consisted of ledgers and cash books, which were kept on the single entry system of accounting. They were incomplete in many respects. No account was kept in which was recorded the amount of cash sales made at Brasington's store or at his orchards. No record whatever was kept of such transactions. Such funds were kept in a cash drawer or in Brasington's pocket until deposited in one of his bank accounts. While a record was kept on his books of his *27 bank accounts, the evidence shows that Brasington made no effort to deposit his receipts intact. Furthermore, some purchases and incidental expenses were not recorded. In each year involved, the cash book showed cash disbursements in excess of cash receipts. When petitioner's accountant, faced with such discrepancies, attempted to compute Brasington's income from the latter's books and records, he was forced to make certain assumptions, having no clear basis in fact, but rather based upon what "appeared" or what "seemed" to be true from the books. All of which points up the fact that Brasington's books and records did not in themselves accurately and clearly reflect his income. Further, since, except for an account in which a record of the taxpayer's bank accounts was kept, there were no capital accounts maintained, no consideration was given by the accountant to capital gains and losses other than what was shown on Brasington's tax returns. Finally, petitioner's accountant, on cross examination, stated that he would not, as a certified public accountant, certify that his ultimate figures represent Brasington's correct net income. On this record, we are constrained to hold that Brasington's *28 books did not clearly reflect his net income and that, therefore, the respondent was justified in adopting a method of computing such income which, in his opinion, did so reflect it. Section 41, supra. The correctness of certain of the computations and adjustments made by respondent in making his determination of Brasington's income by the net worth method is the next question. The record clearly shows and respondent, on brief, acknowledges certain errors in his net worth statement upon which his determination is based. He concedes that the item "Cash in banks" on December 31, 1942, appearing therein, should be reduced from $608.51 to $378.68, and that the item "Merchandise Inventory (cotton)" on December 31, 1944, should be reduced from $21,782.38 to $21,520.22. Such admissions reduce respondent's computation of Brasington's increase in net worth during the years involved to the following: 1942
1943
1944
1945
$8,660.57
$75,173.86
$39,900.29
$4,230.80 In addition to the foregoing, respondent admits that his determination of "Personal expenditures as shown by check" should be decreased to the following: 1942
1943
1944
1945
$4,994.63
$5,021.68
$3,216.64
$1,187.28
*29 With regard to the above-mentioned cotton inventory, petitioner, claiming that Brasington and Childs were partners in the cotton venture and that such inventory was the property of the partnership, protests respondent's treating it as belonging entirely to Brasington. Petitioner points to the payment by Childs of a deficiency based upon unreported income "* * * from partnership Brasington Cotton Company * * *". The preponderating weight of the evidence of record before us, however, tends to support respondent's determination. The cotton in question was insured in Brasington's name and the insurance proceeds, in case of loss, were to be paid to him. Childs, himself, repeatedly stated that he considered the cotton as being Brasington's property. Respondent's determination is sustained on this point. As for respondent's determination of Brasington's personal expenditures made by check, respondent's concessions, set out above, reflect most of the items of which petitioner complains. However, one item of $100 appears to have been improperly classified as a personal expenditure by check in 1944. Therefore, respondent's determination for such year will be further reduced by that amount. *30 Petitioner also argues that respondent's determination of estimated living expenses in the amount of $3,779.89 for 1945, which amount was in addition to that determined as personal expenditures by check for such year, is based upon a mere guess or estimate. While petitioner's contention on this point has some basis in the evidence, nevertheless, a fair inference to be drawn therefrom is that Brasington's personal living expenses were in excess of the amount of respondent's determination of personal expenditures by check as above adjusted. Accordingly, we determine that a fair estimate of such expenses for 1945, in addition to those made by check, is in the amount of $3,190.37. By amendment to the pleadings, petitioner brings into question the propriety of respondent's determination with respect to the sale by Brasington of his peach orchards and the treatment accorded the long term capital gain derived therefrom. Specifically, the question is whether the sale of the orchards was consummated in 1945 or 1946. Respondent has determined that the sale took place in 1945 and has treated the capital gain derived therefrom as having accrued in that year. Petitioner, on the other hand, takes *31 the position that the sale in question was not completed and title to the property involved did not pass until on or about January 25, 1946. It is, therefore, petitioner's contention that the capital gain in question did not accrue until the latter year. In this regard, petitioner maintains, on brief, that the transaction was one in which $5,000 was paid in 1945 for an option to purchase the orchards for $50,000; that the actual sale took place and was completed in January, 1946; and that there is nothing in this record to indicate otherwise. True, the record here is devoid of any evidence bearing upon the several factors usually considered in determining, for tax purposes, when a sale of property was consummated. Cf. Commissioner v. Segall, Transferee, 114 Fed. (2d) 706, certiorari denied 313 U.S. 562. In fact, the only evidence with regard to the transaction in controversy is the testimony of respondent's agent, a certified copy of the deed under which the sale in question was effected, and the 1946 income tax return filed for Brasington by his wife on August 15, 1947, approximately 14 months following the initiation of respondent's investigation. In *32 our judgment, the deed is here the best evidence of the date when the sale was consummated. We have found that the deed bears a signature date of November 6, 1945, an acknowledgment date of November 9, 1945, and a recordation date of January 25, 1946. The date of a deed is the date of its acknowledgment, and absent evidence to the contrary, is the date upon which the sale thereunder is considered to have been effected. The recording thereof serves only as notice to the world that the transaction has taken place, and is an unnecessary and irrelevant factor in so far as the actual transfer of title is concerned. Here the deed was acknowledged on November 9, 1945. Since there is no credible evidence to the contrary, the actual sale and transfer thereunder must be considered as having taken place on that date. Therefore, respondent's determination with respect thereto is affirmed. In view of the foregoing, respondent's determination of Brasington's income for the years involved, as adjusted by respondent's concessions and our holdings herein, is approved. The next issue is the question of fraud. On this issue the burden is upon the respondent to establish the existence of an intent *33 upon the part of Brasington, at the time he filed his returns for the years involved, to defraud the government of taxes legally due. The existence of such an intent is never to be presumed. The evidence thereof must be clear and convincing. Moreover, seldom is such an intent susceptible of being proven by pointing to one specific act or omission. It is a fact to be gleaned, as any other fact, from the evidence of record and inferences properly to be drawn therefrom. Charles E. Mitchell, 32 B.T.A. 1093, affd. sub nom. Helvering v. Mitchell, 303 U.S. 391. If, after a thorough study of the entire record with due consideration for the inferences, there abides a conviction based upon clear and convincing evidence that any part of the deficiency determined by respondent for each year involved is due to a fraudulent intent to evade the tax, then and only then is the 50 per cent addition to tax provided in section 293 (b), [2] I.R.C., properly to be imposed for such year. *34 In the instant case, respondent has shown that there was a large understatement of income in each of the four years before us, and that Brasington was apparently an intelligent businessman. Respondent points to Brasington's failure to return the profits from his cotton ventures in 1944 and 1945, and the $30,516.88 payment received on the sale of peaches to Richter & Cochran in 1943, as specific instances of fraud. However, mere understatement of income is alone insufficient to establish fraud. James Nicholson, 32 B.T.A. 977; L. Glenn Switzer, 20 T.C. - (June 30, 1953). As was said in the latter case: "Fraud implies bad faith, intentional wrongdoing, and a sinister motive. It is never imputed or presumed. Mere suspicion of fraud and mere doubts as to the intentions of the taxpayer are not sufficient proof of fraud. Sharpsville Boiler Works Co., 3 B.T.A. 568 (1925); J. William Schultze, 18 B.T.A. 444 (1929); Arthur M. Godwin, 34 B.T.A. 485 (1936); Arthur S. Barnes, 36 B.T.A. 764 (1937); Nicholas Roerich, 38 B.T.A. 567 (1938), affd. 115 Fed. (2d) 39 (C.A.D.C., 1940), certiorari denied 312 U.S. 700 (1941); *35 L. Schepp Co., 25 B.T.A. 419 (1932)." After a critical view of the entire picture and a careful scrutiny of all the evidence, it is our opinion that respondent has failed to sustain his burden of proving that any part of the deficiency in any of the years in controversy was due to fraud with intent to evade tax. Of course, the burden borne by respondent is unusually heavy in this case due to the incapacity of the taxpayer but that fact does not permit us to invoke any different rule of proof. Respondent's action in imposing the so-called fraud penalty in each of the years is reversed. It follows, therefore, that in the absence of fraud, the assessment and collection of the deficiencies for 1942 and 1943, for which no waivers have been executed, are barred by the statute of limitations. By appropriate amendment to pleadings, respondent now affirmatively seeks, in the alternative, to impose the 5 per cent addition to tax provided in section 293 (a), [3] I.R.C., for the taxable years 1944 and 1945, for which years the necessary waivers have been obtained, because of Brasington's negligence in failing to maintain accurate and complete books of account *36 and in negligently understating his correct taxable income in those years. The record made amply supports respondent's position and justifies the imposition of such 5 per centum addition to tax, which addition will be reflected in the Rule 50 recomputation consequent hereon. Decision will be entered under Rule 50. Footnotes
1. SEC. 41. GENERAL RULE. The net income shall be computed upon the basis of the taxpayer's annual accounting period (fiscal year or calendar year, as the case may be) in accordance with the method of accounting regularly employed in keeping the books of such taxpayer; but if no such method of accounting has been so employed, or if the method employed does not clearly reflect the income, the computation shall be made in accordance with such method as in the opinion of the Commissioner does clearly reflect the income. * * *↩
2. SEC. 293. ADDITIONS TO THE TAX IN CASE OF DEFICIENCY. * * *
(b) Fraud. - If any part of any deficiency is due to fraud with intent to evade tax, then 50 per centum of the total amount of the deficiency (in addition to such deficiency) shall be so assessed, collected, and paid, in lieu of the 50 per centum addition to the tax provided in section 3612(d)(2).↩
3. SEC. 293. ADDITIONS TO THE TAX IN CASE OF DEFICIENCY. (a) Negligence. - If any part of any deficiency is due to negligence, or intentional disregard of rules and regulations but without intent to defraud, 5 per centum of the total amount of the deficiency (in addition to such deficiency) shall be assessed, collected, and paid in the same manner as if it were a deficiency, except that the provisions of section 272(i), relating to the prorating of a deficiency, and of section 292, relating to interest on deficiencies, shall not be applicable.↩