ELIZABETH L. DEYOE, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 2084-73.    Filed August 30, 1976.

*Gary Damon,* for the petitioner.
*Peter Bakutes,* for the respondent.

HALL, *Judge:* Respondent determined the following deficiencies in petitioner's Federal income tax:

| Year | Deficiency |
|------|-----------|
| 1969 | $21,222.25 |
| 1970 | 26,118.93 |

Because of concessions made by the parties, the sole issue before the Court is whether section 1239 of the Internal Revenue Code of 1954 [1] applies to petitioner's sale of her community interest in a ranch to George W. Deyoe, her former husband. This in turn depends on the date the sale occurred, whether petitioner and George W. Deyoe were husband and wife within the meaning of section 1239 on that date, and whether section 1239 was intended to apply to a sale arising out of the dissolution of a marriage.

### FINDINGS OF FACT

Some of the facts have been stipulated by the parties and are found accordingly.

Petitioner, at the time she filed her petition, resided in Modesto, Calif. She filed individual Federal income tax returns for 1969 and 1970.

On June 6, 1938, petitioner married George W. Deyoe (George). On July 3, 1968, petitioner and George separated, and on July 24, 1968, George filed an action for divorce from petitioner in the California Superior Court for Stanislaus County. Both petitioner and George were California domiciliaries during 1968 and 1969. On May 21, 1969, petitioner and George (through their counsel) reached an oral agreement for disposition of George's action for divorce, determination of petitioner's rights to maintenance and support, and division of their community property. Later that day, the attorneys for both parties stipulated to an oral summary of the agreement at a hearing on George's divorce complaint.

The stipulation provided that George would purchase petitioner's entire community property interest in their ranch

---

[1] All statutory references are to the Internal Revenue Code of 1954, as in effect during the years in issue.

located at 7424 Carver Road, Stanislaus County, Calif., for $175,000. The ranch consisted of real property (including orchard trees and other improvements) and farming equipment.

Subsequently petitioner's attorney drafted a written agreement (agreement) memorializing the stipulation, a grant deed conveying petitioner's interest in the ranch, a promissory note bearing interest at 7 percent per year from May 21, 1969, obligating George to pay $175,000 to petitioner for her interest in the ranch, and a deed of trust securing the obligation under the note. The agreement, deed, note, and deed of trust all bore the effective date of May 21, 1969.

On June 18, 1969, petitioner and George executed the agreement. Petitioner acknowledged execution of the agreement before a notary public on June 20, 1969, and George did the same on July 1, 1969. The agreement provides, in part, as follows:

### RECITALS

G. This document is intended to be a final and binding agreement between us irrespective whether our marriage remains undissolved or if a divorce is obtained by either of us.

\* \* \*

### I. *Nature and Extent of Property*

We agree that we are now possessed of real and personal property all of which is community property; and we acknowledge and agree that neither of us is now possessed of any separate property.

\* \* \*

### II. *Equal Division*

As used in this Agreement, the term "community property" shall be deemed to mean our property in existence on May 21, 1969, it being understood and agreed that, except as herein expressly provided otherwise, all income earned and property acquired by each of us after May 21, 1969, is, and shall remain, the separate property of such party.

\* \* \*

### III. *Property Transferred to Wife*

Except as herein otherwise specifically provided, and effective upon the execution of this Agreement, Husband waives, relinquishes and quitclaims to the Wife as her sole and separate property, any or all right, claim or title which Husband has or may have as community or otherwise in and to any and all property, real, personal, or mixed, and wheresoever situate, including but not limited to the following:

\* \* \*

F. A sum equal to one-half of all expenses actually paid up to May 21, 1969, in connection with the operation of our real property located at 7424 Carver

Road, Modesto, California, for the crop year 1969 as determined by Francis B. De Ferrari, accountant, such sum to be paid out of the first proceeds derived from the sale of the 1969 crops.

G. Promissory note dated May 21, 1969 in the sum of One Hundred Seventy-Five Thousand Dollars ($175,000), bearing interest at the rate of 7% per annum on the unpaid balance from May 21, 1969. The said promissory note shall be payable as follows: The sum of $50,750, on or before August 19, 1969, and thereafter in annual installments * * *. Interest as provided shall be payable in quarterly installments commencing August 19, 1969. The said payments shall be made at the Law Offices of Stockton & Schrimp, P.O. Box 3153, Modesto, California, or at such other address as may be designated by Wife.

The said promissory note shall be secured by a first deed of trust, which deed of trust shall contain an acceleration clause, on certain real property situate in the County of Stanislaus, State of California [the ranch] * * *
* * *

## IV. *Property Transferred to Husband*

Except as herein otherwise specifically provided, and effective upon the execution of this Agreement, Wife waives, relinquishes and quitclaims to the Husband as his sole and separate property, any or all right, claim or title which Wife has or may have as community or otherwise in and to any and all property, real, personal, or mixed, and wheresoever situate, including but not limited to the following:
* * *

H. Farming equipment utilized in farming the real property described in subparagraph J hereof.
* * *

J. That certain real property [the ranch], including insurance thereon, situate in the County of Stanislaus, State of California.
* * *

## IX. *Warranties, Releases and Waivers*

* * *

D. Husband and Wife acknowledge that in connection with the operation of their property located at 7424 Carver Road, Modesto, California, there are outstanding obligations which have been incurred, some of which have not yet been paid. All such obligations remaining unpaid on May 21, 1969 are hereby assumed by Husband and he agrees to pay the same and to indemnify and hold Wife free and harmless therefrom.
* * *

H. Each of us agrees upon request of the other at any time to execute and deliver to the other such further deeds, papers or other instruments as may be necessary or convenient to carry out the provisions of this agreement.
* * *

## X. *Finality and Survival*

This Agreement is entire. We may not alter, amend, or modify it except by an instrument in writing executed by both of us. It includes all representations of every kind and nature made by each of us to the other. This Agreement shall

survive its incorporation or merger into or approval in an interlocutory judgment of divorce.

XI. *Effectiveness of Agreement Not Dependent on Court Approval*

It is specifically understood and agreed that this Agreement is not an agreement for divorce, but it is agreed that upon the trial of any action between us involving our matrimonial rights, this settlement agreement may be presented to the Court for its approval; and each of the executory terms and provisions hereof may be incorporated in any decree made based thereon, and each of us may be ordered to comply therewith, but this agreement shall not depend for its effectiveness on such approval, nor be affected thereby.
\* \* \*

IN WITNESS WHEREOF, we execute this Agreement on June 18, 1969, and make it effective as of the 21st day of May, 1969.

Pursuant to the terms of the agreement petitioner executed a deed conveying to George her interest in the ranch. At the time petitioner and George had made their stipulation before the divorce court on May 21, 1969, they contemplated that the deed would be executed within approximately 1 week. However, the deed was not signed and acknowledged until August 27, 1969, and was recorded on August 28, 1969.

The note was executed by George sometime prior to August 19, 1969, and delivered to petitioner's attorney on that date along with two checks. One of these checks, in the amount of $3,062.49, represented 90 days' interest on the note, commencing May 21, 1969. The other check, in the amount of $50,750, represented a principal payment on the note. These checks were transferred to petitioner on August 28, 1969.

Petitioner lived on the ranch for approximately 13 years; she maintained the books and records for the ranch. On or about June 5, 1969, petitioner delivered these books and records to George's accountant, and moved off the ranch. Thereafter a ranch foreman, who had previously assisted petitioner in the operation of the ranch, assumed operating control of the ranch.

An interlocutory decree of divorce was granted to George on July 31, 1969. The decree provided, in part, as follows:

The Court expressly makes no finding concerning the property settlement agreement, it having been stipulated by the parties that the effectiveness of the said agreement shall not be conditioned upon the approval of the same by the Court.

On August 6, 1969, George was granted a final decree of divorce.

Petitioner received $50,750 in 1969 and $124,250 in 1970 from George for her interest in the ranch. Petitioner's adjusted basis in the ranch at the time of the sale to George was $38,467, and her costs of sale were $193. These amounts are allocable to the ranch assets as follows:

|  | Land | Building | Orchard trees | Equipment |
|---|---|---|---|---|
| Sales price | $80,000 | $7,500 | $72,500 | $15,000 |
| Adjusted basis | 15,000 | 7,084 | 4,423 | 11,960 |
| Costs of sale | 89 | 8 | 79 | 17 |

On her 1969 Federal income tax return, petitioner claimed her community one-half share of depreciation on the ranch orchard trees and equipment for the period January 1, 1969, through May 21, 1969. In addition, on both her 1969 and 1970 Federal income tax returns, petitioner reported the transaction involving the conveyance of her interest in the ranch and equipment as a sale occurring on May 21, 1969. The gain on the sale was reported under the installment method of accounting and the entire amount was reported as long-term capital gain.

Respondent in his statutory notice of deficiency determined that the gain on the sale of her interest in the ranch attributable to depreciable property was ordinary income under section 1239.

## OPINION

The sole question in this case is whether section 1239 [2] applies to the sale by petitioner of her community interest in a ranch to George W. Deyoe (George), her former husband. Section 1239 provides generally that gains recognized upon the sale of depreciable property between a husband and wife shall be considered ordinary income to the transferor. Petitioner and respondent agree that the transfer to George of her community

---

[2] Sec. 1239 provides in pertinent part:

(a) TREATMENT OF GAIN AS ORDINARY INCOME.—In the case of a sale or exchange, directly or indirectly, of property described in subsection (b)—

(1) between a husband and wife; or

(2) between an individual and a corporation more than 80 percent in value of the outstanding stock of which is owned by such individual, his spouse, and his minor children and minor grandchildren;

any gain recognized to the transferor from the sale or exchange of such property shall be considered as gain from the sale or exchange of property which is neither a capital asset nor property described in section 1231.

(b) SECTION APPLICABLE ONLY TO SALES OR EXCHANGES OF DEPRECIABLE PROPERTY.—This section shall apply only in the case of a sale or exchange by a transferor of property which in the hands of the transferee is property of a character which is subject to the allowance for depreciation provided in section 167.

property interest in the ranch constituted a sale. They disagree on the date the sale was completed. Petitioner contends that the sale became final after she and George were divorced on August 6, 1969. Respondent asserts that the sale occurred on May 21, 1969, before the divorce, and we agree.

The question of when a sale is complete is essentially a question of fact. No hard and fast rules of thumb exist and no single factor is controlling. The test to be applied is a practical test, taking into account all the facts and circumstances and viewing the transaction in its entirety. *Clodfelter v. Commissioner,* 426 F.2d 1391, 1393-1394 (9th Cir. 1970), affg. 48 T.C. 694 (1967); *Commissioner v. Segall,* 114 F.2d 706, 709 (6th Cir. 1940), revg. 38 B.T.A. 43 (1938).

Among the factors to be considered in determining when a sale is complete are the transfer of legal title and the shift of the benefits and burdens of ownership of the property. *Ted F. Merrill,* 40 T.C. 66, 76 (1963), affd. per curiam 336 F.2d 771 (9th Cir. 1964); cf. *Commissioner v. Segall, supra.* Generally, a sale of real property is complete upon the first of these events to occur. *Dettmers v. Commissioner,* 430 F.2d 1019, 1023 (6th Cir. 1970), affg. 51 T.C. 290 (1968). Where passage of legal title is delayed to secure payment of the purchase price, the intent of the parties as to when the benefits and burdens of ownership of the property are to be transferred becomes relevant. *Ted F. Merrill, supra; Commissioner v. Segall, supra.* Here, petitioner delayed execution and delivery of the deed until the initial payment, promissory note, and deed of trust securing the note were delivered to her. Hence, we must look to the entire transaction to determine whether the benefits and burdens of ownership were transferred prior to August 6, 1969, the date George obtained a final divorce decree.

Under the agreement, George both became liable for ranch operating expenses arising after May 21, 1969, and assumed liability for expenses which were existing and unpaid as of May 21, 1969. On or about June 5, 1969, George's accountant received the ranch books and records from petitioner (who had previously handled the ranch bookkeeping), the ranch foreman assumed petitioner's duties in connection with operating the ranch, and petitioner moved off the ranch.

In addition, under the provisions of the note and agreement, George was required to pay interest at 7 percent per annum on

the unpaid portion of the ranch purchase price commencing on the date of the transfer. On August 19, 1969, George paid $3,062.49 interest for the 90-day period beginning May 21, 1969. The agreement and deed provided that the conveyance of the ranch was to be effective as of May 21, 1969. Although the effective transfer date recited in these documents is not conclusive, it is a factor to be taken into account in ascertaining the date when the sale was completed. Cf. *Clodfelter v. Commissioner, supra* at 1395; *Ted F. Merrill, supra* at 74.

Viewing the transaction in its entirety, we hold that the parties intended that George assume the burdens and benefits of ownership on May 21, 1969. In view of this finding we conclude that the sale was complete on May 21, 1969.

Petitioner also contends that since the provisions of the agreement providing for conveyance of the ranch are executory, they would have been canceled upon reconciliation of the parties. She further argues that this aspect of California law would preclude the completion of the sale until entry of a final judgment of divorce.

California law provides merely that reconciliation may cancel the executory provisions of a property settlement agreement. *Morgan v. Morgan,* 106 Cal. App. 2d 189, 192, 234 P.2d 782, 784 (2d Dist. Ct. App. 1951); *Harrold v. Harrold,* 100 Cal. App. 2d 601, 609, 224 P.2d 66, 70-71 (3d Dist. Ct. App. 1950); *Plante v. Gray,* 68 Cal. App. 2d 582, 588, 157 P.2d 421, 424-425 (2d Dist. Ct. App. 1945). Whether cancellation occurs is a question of fact and the California courts have looked to the mutual intentions and understanding of the spouses in determining whether the agreement continues in force after reconciliation and resumption of marital relations. *Tompkins v. Tompkins,* 202 Cal. App. 2d 55, 59, 20 Cal. Rptr. 530, 532 (2d Dist. Ct. App. 1962). Here, the parties entered into a binding contract that was not expressly conditioned upon the dissolution of their marriage. Hence we conclude that a reconciliation per se would have had no effect upon the agreement.

We also disagree with petitioner's assertion that the agreement was executory. Under California law spouses may settle property rights between themselves by contract. Cal. Civ. Code secs. 158 (repealed Jan. 1, 1970, now sec. 5103), 159, and 160 (repealed Jan. 1, 1970, now sec. 4802) (West 1954). Here, the parties attempted to do so, and reached an oral agreement

(through their attorneys) on May 21, 1969. This agreement was memorialized in a written agreement executed on June 18, 1969. That agreement provided that "effective upon the execution" petitioner quitclaimed to George her interest in the ranch. It further provided that both parties would execute and deliver "upon request" the documents necessary to carry out the provisions of the agreement. Finally, the parties expressly agreed that the agreement's effectiveness was not conditioned upon the dissolution of their marriage. We hold that the agreement contemplated a present sale and conveyance and was not conditioned upon any future event. *Ira v. Ira,* 104 Cal. App. 2d 41, 42, 230 P.2d 867, 868 (2d Dist. Ct. App. 1951). Therefore we conclude that the agreement was not executory, and the sale was complete no later than the date of execution of the written agreement.

We also note that California law provides that a husband and wife may transmute community property to separate property by an oral agreement. Such an agreement is an effective conveyance of real property, and is not in violation of the Statute of Frauds. *Woods v. Security First National Bank,* 46 Cal. 2d 697, 701, 299 P.2d 657, 659 (1956) (and cases cited therein). Actions of the parties, following the oral agreement, consistent with its terms constitute evidence that it was executed. Cf. *In re Raphael's Estate,* 91 Cal. App. 2d 931, 939, 206 P.2d 391, 395 (1st Dist. Ct. App. 1949). Here, George assumed the liabilities and operation of the ranch after May 21, 1969. Petitioner moved off the ranch on June 5, 1969, and concurrently turned over the ranch and its books and records to George. She also reported the sale of the ranch on her 1969 and 1970 Federal income tax returns as a sale occurring on May 21, 1969. See *Heck v. Heck,* 63 Cal. App. 2d 470, 475, 147 P.2d 110, 113 (4th Dist. Ct. App. 1944). A written agreement and deed were subsequently executed by her. Thus, we conclude that the oral agreement, or at the latest the June 18 memorialization of it, constituted an effective present conveyance and sale, and that nothing remained to be done other than the execution of a deed to clear the record title. Cf. *Prince v. Varona,* 144 Cal. App. 2d 673, 301 P.2d 512 (4th Dist. Ct. App. 1956).[3]

---

[3] Petitioner's heavy reliance on *Estate of Brasington,* 12 T.C.M. 1482, 23 P-H Memo. T.C. par. 54,012 (1953), and *Maurine DeWolfe Brown,* 12 T.C.M. 948, 22 P-H Memo. T.C. par. 53,281 (1953), for the proposition that the date of sale is the date the deed conveying

Petitioner next contends that she and George were not "husband and wife" within the meaning of section 1239 at the time of the sale. Although the term "husband and wife" is not defined in section 1239 or any other provision of the Code,[4] this Court has consistently held that for tax purposes marital status is determined under State rather than Federal law. *Harold K. Lee,* 64 T.C. 552, 556 (1975), on appeal (9th Cir., Jan. 15, 1976); *Albert Gersten,* 28 T.C. 756, 770 (1957), affd. on this issue 267 F.2d 195 (9th Cir. 1959); *Eccles v. Commissioner,* 19 T.C. 1049, 1051 (1953), affd. 208 F.2d 796 (4th Cir. 1953).

The marital status of petitioner and George is determined by the law of their domicile. *Harold K. Lee, supra* at 559. Since California was the petitioner's and George's domicile, we look to California law to determine the marital status of petitioner and George at the date of the sale of the ranch.

George filed an action for divorce on July 31, 1968; he was granted an interlocutory decree of divorce on July 31, 1969, and a final judgment of divorce on August 6, 1969. Neither the filing of the action for divorce nor the granting of the interlocutory decree dissolved the marriage. *Seaman v. Commissioner,* 479 F.2d 336, 338 (9th Cir. 1973), and cases cited therein. California does not provide for degrees of divorce. *O'Connor v. O'Connor,* 91 Cal. App. 2d 147, 149, 204 P.2d 916, 917 (1st Dist. Ct. App. 1949). Under California law George and petitioner remained husband and wife until entry of the final judgment of divorce. *Green v. Green,* 66 Cal. App. 2d 50, 57, 151 P.2d 679, 682 (3d Dist. Ct. App. 1944); *Olson v. Superior Court,* 175 Cal. 250, 165 P. 706 (1917).

---

the real property is acknowledged is misplaced. In *Brasington,* this Court relied on the date the deed was acknowledged because the record was devoid of other factors relating to the consummation of the sale. *Estate of Brasington, supra* at 1489. And, although we found the marital settlement agreement in *Maurine DeWolfe Brown* to be an executory contract, our decision there fails to support petitioner's contention here that the sale of the ranch was not completed until execution of the deed conveying it. In *Maurine DeWolfe Brown,* we looked to the entire transaction and found that even though the agreement was phrased in terms of a present conveyance, a supplemental agreement and escrow agreement made it clear that the parties had merely contracted for a conveyance to be made in the future. *Maurine DeWolfe Brown, supra* at 952-953. Here, looking at the entire transaction we are persuaded that the parties contemplated a present sale and conveyance and the delay in execution of the deed was intended merely as a security device.

[4] See, however, sec. 143, which determines marital status for purposes of the standard deduction and personal exemptions, and sec. 672(c), defining related or subordinate party for purposes of grantor trusts.

We therefore conclude that on the date of the sale of her interest in the ranch, George and petitioner were "husband and wife" within the meaning of section 1239.

Petitioner's third argument is that section 1239 was not intended to apply to sales arising out of the dissolution of a marriage. We sympathize with petitioner's plight; however, we are cited no judicial authority, nor do we find any, to support petitioner. In addition, there is nothing in the legislative history [5] of section 1239 which supports her contentions.

We note initially that section 1239 is unambiguous on its face and that petitioner's sale of her community interest in the ranch falls within its express language. Petitioner, however, asserts that the failure of the statute to define the term "husband and wife" requires us to look to the legislative history to determine the scope of the section. She argues that Congress did not intend that section 1239 be applied to bona fide sales where tax-avoidance motives are absent and where the transferor loses control over the transferred depreciable property. In support of her contention petitioner relies heavily upon the language of the Joint Staff Summary of Provisions of the Revenue Act of 1951 (1951-2 C.B. 287, 314). That report, which states that "the bill denies tax benefits available" where depreciable property is sold to the transferor's spouse or controlled corporation, gives the following example:

The following is an example of the tax benefits in the case of the sale of depreciable property by a taxpayer to a controlled corporation: Assume that a taxpayer owns and operates a corporation engaged in retail trade, that he also owns as an individual the building used by this corporation and that the current value of the building is well in excess of its adjusted basis. If the building is sold to the corporation, a capital-gains tax will ordinarily be paid, but the building then has, in the hands of the corporation, an adjusted basis which is greater than the basis in the hands of the individual shareholder by the amount of the gain realized on the sale to the corporation. The property being depreciable the corporation will then be able to write off the increase in the adjusted basis over the remaining life of the building. The resulting additional depreciation charges are an offset to ordinary income. Thus, in effect, the immediate payment of a capital-gains tax has been substituted for the elimination, over a period of years, of the corporate income taxes on an

[5] Sec. 1239 had its origin in sec. 328(a) of the Revenue Act of 1951. It first appeared as sec. 117(o) of the Internal Revenue Code of 1939, and was adopted substantially unchanged in the reorganization of the Code in 1954. See H. Rept. No. 586, 82d Cong., 1st Sess. (1951), 1951-2 C.B. 357, 376; H. Rept. No. 586, 82d Cong., 1st Sess. (1951), 1951-2 C.B. 357, 444; S. Rept. No. 781, 82d Cong., 1st Sess. (1951), 1951-2 C.B. 458, 507; Conf. Rept. No. 1213, 82d Cong., 1st Sess. (1951), 1951-2 C.B. 622, 631.

equivalent amount. The differential between the capital-gains rate and the ordinary rates makes such a substitution advantageous when the sale may be carried out without loss of control over the asset because the corporation to which the asset is sold is controlled by the individual who made the sale.

A similar advantage is possible where such a sale is made between husband and wife.

In a divorce situation obviously the parties do not get the benefit described because the asset does not remain within the control of the seller as a result of the marital dissolution. However, the language of the statute is unambiguous and we cannot disregard the clear language of the statute merely because the example provided in the report involves a situation different from the transaction in issue. See *W. H. Weaver,* 32 T.C. 411, 435 (1959), affd. on this issue sub nom. *Bryan v. Commissioner,* 281 F.2d 238, 242 (4th Cir. 1960) (the decision dealt with the predecessor of sec. 1239(a)(2)). If Congress had intended to limit the scope of section 1239 it could have provided exceptions within the statute. Where Congress did not see fit to make an exception for arm's-length transactions arising out of a marital dissolution, we cannot do so. We derive further support for our conclusion from the lengthy history of the Internal Revenue Service's fruitless attempts, when the shoe is on the other foot, to establish the proposition that couples under interlocutory decrees of divorce were not "husband and wife" for purposes such as filing joint returns under the predecessor of section 6013. *Commissioner v. Ostler,* 237 F.2d 501 (9th Cir. 1956); *Commissioner v. Evans,* 19 T.C. 1102 (1953), affd. 211 F.2d 378 (10th Cir. 1954); *Eccles v. Commissioner, supra.* The term "husband and wife" simply has insufficient elasticity for us to remedy judicially the absence of a statutory exception for the dissolution case.[6] If Congress desired such an exception, it may, of course, so provide. But until it does so, we must hold that words mean what they say, whichever way the chips may fall.

*Decision will be entered under Rule 155.*

---

[6] We are aware that family hostilities have been taken into consideration in applying the attribution rules of sec. 318 to stock redemptions. See *Haft Trust v. Commissioner,* 510 F.2d 43 (1st Cir. 1975), revg. 61 T.C. 398 (1973). We cannot impart those general concepts into sec. 1239, for *Haft Trust* construed a very different set of statutory words— "essentially equivalent to a dividend"—words which Congress clearly intended to receive judicial elaboration and not the words "husband and wife" which face us here.